Samuel Joe JUDICE and Kathryn
Tandy Thompson, Appellants,

v.

MEWBOURNE OIL COMPANY,
et al., Appellees.

No. 07–93–0080–CV.

Court of Appeals of Texas,
Amarillo.

Dec. 7, 1994.

Rehearing Overruled Jan. 11, 1995.

Patton, Boggs & Blow, D. Patrick Long, Dallas, for appellants.

Underwood Law Firm, Thomas R. Dixon, Kevin P. Parker, Gregory M. Bednarz, Amarillo, for appellees.

Before REYNOLDS, C.J., and BOYD and POFF, JJ.

## ON MOTION FOR REHEARING

POFF, Justice.

We overrule Samuel Joe Judice and Kathryn Tandy Thompson's motion for rehearing as well as Mewbourne Oil Company's motion for rehearing; however, in light of the motions for rehearing, we withdraw our opinion of April 29, 1994 and vacate the judgment of that date. We substitute this opinion in lieu of our former opinion.

This appeal involves the construction and interpretation of an oil and gas lease. Appellants Samuel Joe Judice and Kathryn Tandy Thompson appeal from that portion of a judgment declaring that the oil and gas lease in question had not terminated as to a certain formation. Appellees advance three cross-points. We will affirm.

On July 1, 1978, Kathryn A. Judice entered into an oil and gas lease with Mewbourne Oil Company, appellee,[1] in which Judice granted and leased unto Mewbourne the right to prospect and drill for oil and gas and the right to produce oil and gas. The property subject to the lease was described as "All of the East Half of the Northwest Quarter (E/2 of NW/4) of Section 79, Block 13, T. & N.O.

RR. Co. Survey," in Ochiltree County, Texas. Appellants are the successors in interest to Kathryn A. Judice.

The lease's habendum clause provided for a primary term of three years and a secondary term for "as long thereafter as oil and gas, or either of them, is produced in paying quantities from the land hereby leased." The lease also contained a termination clause, found in paragraph 32 of the lease, that reads as follows:

> Notwithstanding anything in this lease agreement to the contrary, and within six (6) years from the date of this lease, Lessee shall, by instrument in recordable form, release, relinquish and surrender unto Lessor all its right, title and interest in all zones and formations except those that are then producing in paying quantities.

The combination of the habendum clause and the termination clause creates a primary term of three years, a subsequent three-year period wherein production in paying quantities in any formation will hold the entire leased premises, and then a period of time beginning six years after the date of the lease wherein only production in paying quantities in a particular formation will hold that formation.

Appellants contend that under the undisputed facts of this case, the lease terminated as to a formation known as the Morrow formation on July 1, 1984—six years after the date the lease was signed. In their first point of error, appellants charge that the trial court erred in failing to hold, as a matter of law, that the lease terminated as to the Morrow formation. In their second point of error, appellants contend that the trial court erred in overruling their motion to disregard findings on questions submitted to the jury because the evidence established as a matter of law that the lease terminated as to the Morrow formation. In response to both points, Mewbourne maintains that the trial court correctly determined, as a matter of law, that the lease did not terminate as to the Morrow formation.[2]

---

1. There are several other appellees. We will refer to all appellees as "Mewbourne."

2. In its final judgment, the trial court stated that "as a matter of law, the oil and gas lease cover-

The record shows that in 1981, Mewbourne drilled a well on the subject property and began producing and selling gas from the Morrow formation. The production and sale of gas from the Morrow formation continued through May 5, 1984. On that day, Mewbourne installed a retrievable bridge plug in the well which prevented production from the Morrow formation while Mewbourne reworked the well to develop production from the shallower Cleveland formation. Mewbourne was required to install the bridge plug by a Texas Railroad Commission rule prohibiting the commingling of gas streams from two different geological formations without Railroad Commission approval. On July 11, 1984, Mewbourne received approval from the Railroad Commission to commingle gas streams from the Morrow and Cleveland formations so Mewbourne removed the retrievable bridge plug and the profitable production of gas from the Morrow formation continued. There was no physical production from the Morrow formation for a little over two months—from May 5, 1984 to July 11, 1984.

Appellants find it very significant that there was no physical production from the Morrow formation on July 1, 1984. Appellants contend that under the termination clause, actual physical production was required from a particular zone or formation on July 1, 1984 in order for Mewbourne to keep its lease from terminating as to that zone or formation. Because there was no physical production from the Morrow formation on July 1, 1984, appellants argue that Mewbourne's lease terminated on that date as to the Morrow formation.

■ Appellants argue that the use of the word "then" refers solely to the date six years after the date of the lease, i.e., July 1, 1984. Mewbourne contends that the word "then" should not be construed to refer to the one date at the end of the six-year period. Rather, Mewbourne argues, it should be construed to refer to the entire six-year time period referenced in paragraph 32. We agree with appellants that the word "then" refers to July 1, 1984.[3] However, we disagree with appellants' contention that actual, physical production was required from the Morrow formation on that date in order to prevent a termination of Mewbourne's lease as to that formation.

When physical production from the Morrow formation came to a halt on May 5, 1984, the lease was in its secondary term. This interruption in physical production constituted a temporary cessation of production, thereby bringing the lease's savings provision into play. The savings provision, found in paragraph 6 of the lease, gives Mewbourne ninety days to commence drilling or reworking following a cessation of production in order to keep the lease in effect. In pertinent part, paragraph 6 reads as follows:

> It is further provided that if production, having once been obtained, shall cease for any cause and the lease is not otherwise maintained in force and effect, this lease shall not terminate if the Lessee commences additional drilling or reworking within ninety (90) days thereafter, and such lease shall remain in full force and effect so long as such operations continue in good faith and workmanlike manner without interruptions totaling more than ninety (90) days during any one such operation; and if such drilling or reworking operation result in the production of oil or gas, such lease shall remain in full force and effect so long as oil or gas is produced therefrom in paying quantities.

■ Under the express terms of the savings clause, Mewbourne was given ninety days to begin reworking operations if production should cease "for any cause."[4]

ing the Judice No. 6 Well did not terminate as to the rights in the Morrow formation. . . ."

3. The word "then" refers to either a specific date within the six-year period on which a release is executed, or, if no release is executed, the last day of the six-year period. Because Mewbourne did not execute a release, the word "then" refers to the last day of the six-year period—July 1, 1984.

4. Had the parties failed to include the 90–day savings provision in their lease, the cessation of physical production could be deemed temporary only if the cessation of physical production was due to "sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like." *Watson v. Rochmill,* 137 Tex. 565, 155 S.W.2d 783, 784 (1941). In such an event, Mewbourne would be entitled to a reasonable time to remedy the defect

Thus, Mewbourne had ninety days from May 5, 1984 to commence reworking operations to restore production from the Morrow formation. It is unquestioned that Mewbourne did so because the Morrow formation was producing again on July 11, 1994. While Mewbourne's lease would have terminated as to the Morrow formation had it not commenced reworking operations within ninety days of the cessation of physical production, *see Bachler v. Rosenthal*, 798 S.W.2d 646, 649–50 (Tex.App.—Austin 1990, writ denied), the fact is that Mewbourne did commence reworking operations within ninety days of May 5, 1984. Accordingly, Mewbourne's lease did not terminate as to the Morrow formation.

■ Appellants contend that the ninety-day reworking clause set forth in paragraph six is preempted by the language at the beginning of paragraph 32. We have already set forth the language of paragraph 32 but will do so again here with the questioned language in italics.

*Notwithstanding anything in this lease agreement to the contrary,* and within six years from the day of this lease, lessee shall, by instrument in recordable form, release, relinquish and surrender unto lessor all of its right, title and interest in all zones and formations, except those that are then producing in paying quantities.

■ We do not agree with appellants. Were we to accept appellants' argument, paragraph six would be rendered entirely meaningless, thereby contravening the well-established general rule that "the parties to an instrument intend every clause to have some effect and in some measure to evidence their agreement." *City of Pinehurst v. Spooner Addition W. Co.*, 432 S.W.2d 515, 518 (Tex.1968). The introductory clause of paragraph 32 should be interpreted in a manner that harmonizes the various provisions of the lease rather than in a way that causes a provision to be ignored.

We find the language in paragraph 32 to be a limitation on the conveyance rather than a limitation on the lessee's right to rework the well. The effect of the restrictive language in paragraph 32 is that the lease given did not cover all the minerals but only those formations producing in paying quantities six years from the date the lease was signed. Unlike many leases, under the terms of this lease, production from one formation does not hold all formations more than six years after the lease was signed.

Appellants' contention that the lease terminated as to the Morrow formation as a matter of law is unavailing. Points of error one and two are overruled.

■ In their third and fourth points of error, appellants argue that there is an irreconcilable conflict between the jury's answers to Questions 4 and 5 and that, therefore, the trial court erred in overruling appellants' motions for mistrial and new trial. The jury's answers are arguably in conflict. However, the conflict between the answers, if any, is immaterial. The trial court did not base its judgment on the answers to Questions 4 and 5. Rather, as mentioned in footnote 2, the trial court found that Mewbourne's rights in the Morrow formation did not terminate "as a matter of law." It is well established that conflicting jury findings are to be disregarded if they are immaterial. *Texas & Pac. Ry. Co. v. Snider*, 159 Tex. 380, 383, 321 S.W.2d 280, 282–83 (1959). Because the jury answers at issue are immaterial, the trial court did not err in declining to grant appellants' motions for mistrial and new trial. Points of error three and four are overruled.

■ Mewbourne brings three cross-points that concern a different aspect of the trial court's judgment. The trial court awarded appellants $101,658.01 for compression costs which Mewbourne had deducted from appellants' royalties up to the date of trial. The court's award was partially based on the jury's finding that appellants and

and resume production. *Id.* In this case, however, the parties agreed that upon a cessation of production *for any reason*, Mewbourne would have a period of exactly ninety days within which to commence reworking operations in order to keep the lease alive as to the particular forma-

tion. Where the parties have negotiated a specific cessation of production clause as they have here, the terms of the clause preempt the application of the common law temporary cessation of production doctrine. *Samano v. Sun Oil Co.*, 621 S.W.2d 580, 584 (Tex.1981).

Mewbourne had intended that the royalties "were to be based upon the price received by the working interest owners from the purchasing pipeline, without deduction for compression charges." The award was also based on the jury's finding that Mewbourne accepted the division orders executed by appellants "as setting forth the basis upon which the royalties were to be paid." In its first cross-point, Mewbourne contends that the trial court erred in entering judgment in favor of appellants for compression costs deducted from their royalties because appellants failed to submit a question to the jury as to whether the division orders had been breached.

Mewbourne reasons that the division orders controlled the manner in which the royalties were to be paid and that, the jury having found Mewbourne accepted the division orders, the division orders remained in effect until such time as they were revoked. Thus, Mewbourne argues, appellants' recovery for compression charges is dependent upon a finding that Mewbourne's deduction of compression charges was a breach of the division orders. We disagree.

The jury's finding that compression charges were not to be deducted from royalties served as a sufficient basis for the trial court's award. It is undisputed that Mewbourne deducted compression charges. It was not necessary for appellants to secure a jury finding that the division orders were breached. Nor was it necessary for appellants to secure a jury finding that the division orders set forth the basis upon which the royalties were to be paid. Cross-point one is overruled.

In its second cross-point, Mewbourne argues that the trial court erred in submitting Questions 9 and 10 to the jury. Those questions asked whether appellants and Mewbourne intended that the royalties were to be based upon the price received by the working interest owners from the purchasing pipeline, without deduction for compression charges on Leases No. 2 and No. 3. Mewbourne claims that the submission of the questions was improper because Leases No. 2 and No. 3 unambiguously allowed the deduction of compression costs from appellants' royalties. Based on the same reasoning is Mewbourne's

third cross-point in which Mewbourne contends the trial court erred in ordering that compression charges should not have been deducted from appellants' royalties under Leases No. 2 and No. 3 because those leases allowed for the deduction of compression charges as a matter of law.

In our view, a question of fact existed concerning the parties' intent concerning compression charges. Therefore, it was entirely proper to submit the question of the parties' intent to the jury. We do not agree with Mewbourne that the leases allowed for the deduction of compression charges as a matter of law. Cross-points two and three are overruled.

The judgment of the trial court is affirmed.