**SUN OPERATING LIMITED PARTNER-SHIP, Oryx Energy Company, Its General Partner, Faulconer Energy Joint Venture—1988, Global Natural Resources Corporation of Nevada, and Chevron U.S.A., Inc., Appellants,**

v.

**Elizabeth HOLT, Robert P. Holt, Comfort Holt Winders, Nick D. Holt, and Coy Miles Holt, Appellees.**

**No. 07–97–0010–CV.**

Court of Appeals of Texas, Amarillo.

Oct. 29, 1998.

Opinion Denying Rehearing Dec. 3, 1998.

Rehearing Overruled Jan. 7, 1999.

---

Gibson, Ochsner & Adkins, L.L.P., S. Tom Morris, Amarillo, for appellants.

Templeton, Smithee, Hayes & Fields, Joe W. Hayes, John T. Smithee, Coleman Young, Amarillo, Law Offices of Bob Pearson, Bob Pearson, for appellees.

Before BOYD, C.J., and DODSON and QUINN, JJ.

QUINN, Justice.

Elizabeth Holt, Robert P. Holt, Comfort Holt Winders, Nick D. Holt, and Coy Miles Holt (collectively referred to as the Holts) sued Sun Operating Limited Partnership, Oryx Energy Company, its General Partner, Faulconer Energy Joint Venture—1988, Global Natural Resources Corporation of Nevada, and Chevron U.S.A., Inc. (collectively referred to as the Sun Parties) and others for a judgment declaring that two oil and gas leases had terminated and for damages arising from the acquisition of product from the lands after termination. The causes of action alleged sounded in equity and tort, that is, they included a demand for 1) an accounting and restitution and 2) damages for conversion and trespass. After conducting a bifurcated trial by jury, the court entered judgment declaring that the leases had terminated and awarding damages to Elizabeth and Robert Holt. Both the Sun Parties and Holts appealed. Though the Sun Parties alleged seven points of error, and the Holts nine, we need only address the first three uttered by the Sun Parties. They are dispositive and involve 1) whether the cessation of production was temporary which, in turn, afforded the Sun Parties a reasonable time to resume production and 2) whether the cessation of production was excused via the force majeure clauses contained in the leases. We reverse and remand.

## Background

The dispute involved two oil and gas leases (referred to as leases number one and two) affecting interests in property located in Hansford County. The Sun Parties were either the original lessees or succeeded to the interest of the original lessees under each agreement, while the Holts succeeded to the interests of the original lessors under lease number one and Elizabeth and Robert Holt succeeded to the interests of the original lessors under lease two. Each document was executed in December of 1947 and contained several provisions pertinent to this appeal. The first dealt with the lease term:

Subject to other provisions herein contained, this lease shall remain in force for a term of ten years from this date, called primary term, and as long thereafter as oil, gas or other mineral is produced from said land, or as long thereafter as Lessee shall conduct drilling or re-working operations thereon with no cessation of more that sixty consecutive days until production results, and if production results, so long as any such mineral is produced.

The second pertained to possible interruptions in drilling and operations caused by various specified acts. Referred to by us as the force majeure clause, it provided that:

When drilling or other operations are delayed or interrupted by lack of water, labor or materials, or by fire, storm, flood, war, rebellion, insurrection, riot, strike, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some order, requisition or necessity of the government, or as the result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding.

After execution of the leases, the lessee drilled wells and extracted gas from the land in paying quantities. This continued until April 11, 1983. At that time, the land encompassed by lease number one held five producing wells. That under lease two held five similar wells. Moreover, the gas obtained from each was being purchased by Panhan-

dle Eastern Pipeline Company (Panhandle) and transported from the leases via Panhandle's transmission line 200. No other transmission line was connected to the wells.

As previously alluded to, the production of gas was interrupted on April 11th. Panhandle had begun major repairs and renovations upon line 200 which caused production from both leases to cease for more than 60 consecutive days. Production resumed, however, by September 23, 1983, the date on which the repairs were completed. All concede that the wells were *capable* of producing during the entire time.

From the foregoing interruption arose the present controversy. The Holts invoked that portion of the habendum clause directing that the lease remain in force as long as production does not stop for more than 60 consecutive days. Because it had so stopped, they argued that the leases automatically terminated. The Sun Parties disagreed with their opponents' interpretation of the events, and the results thereof, and raised various defenses. The two pertinent here concerned 1) whether they had a reasonable (as opposed to a specific) time within which to resume production, and 2) whether the cause of the interruption fell within the scope of the force majeure clause which, in turn, prevented the cessation from causing the leases to terminate.

Trial of the suit was bifurcated into separate proceedings involving liability and damages. During the former, the court submitted only one question to the jury which read:

> Do you find that the failure to produce oil, gas and other minerals from the Lease Number 1 premises and the Lease Number 2 premises during the period of May 26, 1983, to August 1, 1983, was solely caused by "force majeure" as defined by paragraph 10 of Lease Number 1 and Lease Number 2?
>
> Answer "Yes" or "No"
>
> Answer: _____
>
> In answering this question you should consider paragraph 10 of the leases in its entirety ...

\* \* \*

In connection with Question No. 1 you are instructed as follows:

(a) Before such an occurrence can constitute "force majeure," the operators of the wells located on the Lease Number 1 and Lease Number 2 premises must have exercised due diligence and taken all reasonable steps to avoid, remove and overcome the effect of "force majeure".

(b) For "force majeure" to be the sole cause of the failure to produce oil, gas and other minerals from the Lease Number 1 and Lease Number 2 premises during the period of May 26, 1983, to August 1, 1983, the alleged "force majeure" must have been the only cause of said failure and said failure cannot have been caused in whole or in part by the negligence of the operators of the wells located thereon.

(c) "Negligence" shall mean the failure to act as a reasonably prudent operator under the same or similar circumstances.

To the only question posed, the jury answered "no." Based upon this finding, the court declared that the leases were terminated. Damages were eventually awarded to the Holts once the remaining portion of the bifurcated trial was completed.

Unsatisfied, both parties appealed from the final judgment and asserted a myriad of error. However, we find several raised errors in the Sun Parties' brief dispositive of the appeal and address them. Finally, in addressing them, we do not necessarily do so in numerical sequence but rather in their logical sequence.

### Point of Error One

Through their first point, the Sun Parties invoke the rule of temporary cessation. That is, they argue that the interruption was temporary. Being temporary, it did not serve to end the leases. *See Midwest Oil Corp. v. Winsauer*, 159 Tex. 560, 563, 323 S.W.2d 944, 946 (Tex.1959) (holding that implied within an oil and gas lease is the provision that temporary interruptions in production of commercial quantities will not cause the lease

to terminate). Yet, they also recognize that the foregoing rule does not apply when leases, like those here in question, contain a provision in the habendum clause which expresses a time limitation within which continued drilling or reworking operations must be conducted.[1] *Samano v. Sun Oil Co.,* 621 S.W.2d 580, 581–84 (Tex.1981); *Judice v. Mewbourne Oil Co.,* 890 S.W.2d 180, 182 n. 4 (Tex.App.—Amarillo 1994), *modified on other grounds,* 939 S.W.2d 133 (Tex.1996). So, they encourage us to create an exception to *Samano* which "should be recognized when the cessation ... is NOT caused by depletion, mechanical problems or intentional conduct of the lessee." (emphasis in original, underlining omitted). We disagree and overrule the point.

■ The Sun Parties accurately note that in many of the cases wherein the temporary cessation rule was modified by the CPL clause, production had ended because the wells were incapable of producing. Thus, additional reworking, drilling, or mechanical operations may have been necessary to resume production in those circumstances. Yet, no case has been found which restricts application of a CPL clause to situations where production ceases solely because of mechanical breakdown, depletion, or the like. Nor do we care to be the first to so hold, given the purpose of the clause. As illustrated by the Texas Supreme Court in *Samano,* a CPL clause deals with prolonging the viability of the lease once production stops, not with the reasons why production stopped. *Samano v. Sun Oil Co.,* 621 S.W.2d at 583–84. That is, once production stops, it provides the lessee a means of preventing the lease from terminating. *Id.* And, the means involve initiating those acts described in the clause (*i.e.,* drilling or reworking) within and for the time specified. *Id.*

For example, if the habendum clause in mineral lease X specified a primary term of ten years, followed by a statement revealing the secondary term to be "so long as minerals are produced," which statement is then followed by another clause reading "as long

thereafter as the lessee shall conduct drilling or reworking operations without cessation for 60 days," then there are three ways to maintain the lease. The first is to produce minerals by the time the primary term expires. The second is to maintain production during the secondary term. Should production cease during the secondary term, the third way is to begin drilling or reworking without cessation for 60 days. *Samano v. Sun Oil Co.,* 621 S.W.2d at 583–84. That production stopped, even though the wells were capable of producing, does not negate the latter means of extending the lease. Rather, the lessee still has 60 days to either remedy the situation which caused production to stop or initiate drilling or reworking operations even though the other wells are capable of production. This may seem "illogical" to the Sun Parties. But, that is what the parties agreed to in the lease, according to *Samano,* and we are bound to follow their agreement even though it may be "nonsensical."

■ So, because the lease at bar expressed a time within which drilling and reworking had to be initiated once production ended, the temporary cessation rule invoked by the Sun Parties does not apply. If parties to a lease want the rule to apply in situations like that before us, they should expressly say so in the lease.

### Point of Error Three

The third point raised by the Sun Parties involves the court's charge on force majeure. They contend that the instruction accompanying it was inaccurate since it imposed upon them the "burden to prove that they could not have overcome the interruption of production by the exercise of reasonable diligence." We agree and sustain the point.

■ The theory of force majeure has been existent for many years. Often likened to impossibility, it historically embodied the notion that parties could be relieved of performing their contractual duties when performance was prevented by causes beyond their control, such as an act of God. 6A CORBIN,

1. Such a provision has been coined a "cessation of production clause." *See Judice v. Mewbourne Oil Co.,* 890 S.W.2d 180, 182 n. 4 (Tex.App.— Amarillo 1994), *modified on other grounds,* 939 S.W.2d 133 (Tex.1996). For the sake of clarity we will refer to it as a CPL clause.

CORBIN ON CONTRACTS § 1324 (1962). But, much of its historic underpinnings have fallen by the wayside. Force majeure, is now little more than a descriptive phrase without much inherent substance. Indeed, its scope and application, for the most part, is utterly dependent upon the terms of the contract in which it appears. This court recognized as much in *Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427 (Tex.App.—Amarillo 1993, no writ), when we said that the "lease terms are controlling regarding *force majeure*, and common law rules merely fill in gaps left by the lease." *Id.* at 436 (italics in original).[2] In other words, when the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure. *Id.; Texas City Ref., Inc. v. Conoco, Inc.*, 767 S.W.2d 183, 186 (Tex.App.—Houston [14th Dist.] 1989, writ denied). More importantly, we are not at liberty to rewrite the contract or interpret it in a manner which the parties never intended.

Here, the trial court instructed the jury that before an occurrence may constitute force majeure, the well operators "must have exercised due diligence and taken all reasonable steps to avoid, remove and overcome the *effects* of 'force majeure.'" (emphasis added). Yet, the lease provision at issue stated that:

> When drilling or other operations are delayed or interrupted by lack of water, labor or materials, or by fire, storm, flood, war, rebellion, insurrection, riot, strike, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some order, requisition or necessity of the government, or as the result of any cause whatsoever beyond the control of the Les-

see, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding.

In comparing the clause with the instruction given by the court, we find nothing in the former that expressly obligates the lessee to do that described in the latter. In other words, the clause says nothing about requiring the lessee to "exercise[] due diligence and take all reasonable steps to avoid, remove and overcome the *effects* of 'force majeure.'" (emphasis added). It says nothing about the lessee having to act reasonably to *remediate* the result caused by the force majeure event. Rather, the parties merely agreed that when certain specified acts occurred, any resulting delay or interruption in "drilling or other operations" was not to "be counted against Lessee." Given this, we choose not to rewrite the contract by interjecting such a duty.

Moreover, the cases and policy reasons cited by the Holts do not sway us otherwise. First, the case of *National Compress Co. v. Hamlin*, 264 S.W. 488 (Tex.Civ.App.—Dallas 1924, writ dism'd w.o.j.) did not involve a mineral lease but rather the relationship of bailor and bailee. Nor did it purport to address the effect a force majeure clause had upon the allegations of the plaintiff. Indeed, the dispute did not even involve a force majeure clause. Nor did the court in *National Compress* state that anyone had a duty to diligently remediate *after* the unexpected event occurred. Instead, it expounded upon the bailee's duty to take measures against foreseeable injury *before* the injury happened. So, *National Compress* is quite inapposite.

---

2. Indeed, other courts have gone farther and indicated that force majeure is utterly dependent upon the terms of the contract. For instance, in *Perlman v. Pioneer Limited Partnership*, 918 F.2d 1244 (5th Cir.1990), the court viewed the concept as "not a fixed rule of law that regulates the content of all force majeure clauses, but instead [as] a term that describes a particular type of event ... which may excuse performance...." *Id.* at 1248 n. 5. According to *Perlman,* merely labeling a condition or event "force majeure" does not *per se* mandate that the occurrence of the event excuses performance. *Id.* Instead, the

court must look to the language of the contract to determine whether the parties intended that the event excuse performance. *Id.; see PPG Indus., Inc. v. Shell Oil Co.*, 919 F.2d 17, 18 (5th Cir.1990) (recognizing that the reasonable control requirement which was allegedly an element in the historic doctrine of force majeure was applicable not because of the dictates of common law but because the parties so stated in their contract). Whether we need go as far as the *Perlman* court is beyond the scope of this appeal, given the language of the contract before us. That language will be addressed later in the text.

As to the second case cited by the Holts, *United Gas Pipe Line Co. v. Federal Energy Regulatory Commission,* 824 F.2d 417 (5th Cir.1987), we immediately note that the force majeure clause there stated that the event of force majeure must not only have been outside United's control but also one "which by the exercise of due diligence [United was] unable to prevent or overcome...." *Id.* at 432 n. 19. But, again, no such statement appears in the contract before us. Moreover, the *United* court did not purport to address whether due diligence would have been required had the parties not agreed to it. So, like *National Compress, United* had nothing to do with the issue before us.

As to the Holt's notion that public policy demands that we imply such an obligation into the clause, we say the following. Well operators should not be allowed to simply sit back and do nothing once production has ceased. Yet, that is no reason to rewrite the parties' contract when the law already exists to prevent a lessee from doing that. Indeed, the Texas Supreme Court imposed upon lessees and well operators various duties addressing the concern raised by the Holts. Those duties include the obligations to develop the premises, protect the leasehold, and manage and administer the lease. *Cabot Corp. v. Brown,* 754 S.W.2d 104, 106 (Tex. 1987); *Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 567 (Tex.1981). And, within the task of management and administration lies the requirement that the lessee reasonably market the mineral produced and secure the best price reasonably possible. *Cabot Corp. v. Brown,* 754 S.W.2d at 106.

More importantly, if an operator chooses to do nothing once an event of force majeure occurred and terminated production, it is quite conceivable that his actions would run afoul of one or more of the aforementioned duties. At the very least, one could argue a lessee breaches his duty to manage and administer when the mineral remains in the ground despite the availability of reasonable measures to extract and sell it. The remedy for such a breach would be a suit for damages or, in extraordinary circumstances, termination of the lease. *Rogers v. Ricane*

*Enters., Inc.,* 884 S.W.2d 763, 767–68 (Tex. 1994).

Simply put, the policy argument voiced by the Holts has been adequately addressed via other bodies of oil and gas law. Thus, there is no need for us to provide further remedy by implying into every force majeure clause the requirement that the lessee exercise diligence to overcome the effects of force majeure once it occurs.

■ In sum, the Sun Parties correctly argue that the court erred in instructing that they had to use due diligence to avoid, remove, and overcome the effects of force majeure. Such was not intended by the parties, given the language in their agreement. Nor do we choose to contort their language to achieve an end that effectively works a forfeiture. *See Kincaid v. Gulf Oil Corp.,* 675 S.W.2d 250, 256 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.) (stating that the court must "bear in mind that if ... language [of a lease] is reasonably susceptible of a construction ... that prevents a forfeiture, such construction is to be preferred to one resulting in a forfeiture").

■ As to whether the court's error was harmful, we note several things. First, after perusing the record it appears that a major thrust of the Holts' suit involved the Sun Parties' alleged failure to use diligence in remediating the force majeure event and resulting absence of production. Second, the inaccurate instruction was submitted to the jurors as a means of assisting them in deciding the only question presented during the liability phase of the trial. Third, the Holts repeatedly emphasized, during their closing argument, the instruction and the Sun Parties' alleged failure to exercise diligence to overcome the effects of the force majeure event and regain production. Under these circumstances we cannot but conclude that the instruction probably caused the rendition of an improper judgment and that the mistake was harmful as per Texas Rule of Appellate Procedure 44.1(a)(1). We accordingly sustain point of error three.

### Point of Error Two

In their second point, the Sun Parties assert that they were entitled to a directed verdict since the evidence conclusively established that the sole cause for the cessation in production was the failure of Panhandle to transport the gas. And, since Panhandle's failure to transport fell within the scope of the force majeure clause, the cessation allegedly could not result in termination of the lease.

In determining whether a directed verdict was appropriate, we must undertake a two step analysis. The first step requires us to construe the force majeure clause. Once that is done, we must then apply the evidence of record to determine if it conclusively established that the force majeure event was the sole cause of the cessation.

*a. Construction of the Force Majeure Clause*

##### 1. Does the Phrase "other operations" Include Production?

According to the force majeure clause, any delay or interruption in "drilling or other operations" is "not [to] be counted against" the lessee if that delay or interruption is caused by a specified force majeure event. Thus, to successfully invoke the clause at bar, the Sun Parties must initially show that the concept of production falls within the scope of "drilling or other operations." Here, they contend that it comes within the parameters of "other operations." We agree for several reasons.

■ First, in construing the words of a contract, we must accord them their plain, ordinary, and generally accepted meaning unless the document provides otherwise. *Melvin Green, Inc. v. Questor Drilling Corp.*, 946 S.W.2d 907, 911 (Tex.App.— Amarillo 1997, no writ). Next, lay authorities commonly describe "operation" to mean 1) a process or series of acts performed to effect a certain purpose or result or 2) a

process or method of productive activity. AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 920 (1976); *see* WEBSTER'S NEW COLLEGIATE DICTIONARY 804 (1976) (defining "operation" as a method or manner of functioning). In other words, the ordinary definition of the word "operation" connotes an overall process aimed at achieving a particular end.

■ When that meaning is considered in the context of an oil and gas lease we cannot but conclude that the term encompasses the production of minerals. For example, such leases are executed for the purpose of developing the field, obtaining production, and paying the royalty owners. *Circle Dot Ranch, Inc. v. Sidwell Oil & Gas, Inc.*, 891 S.W.2d 342, 346 (Tex.App.—Amarillo 1995, writ denied). That this is true is exemplified by the duties which have been implicitly assigned to the lessee. Again, they include the tasks of developing, protecting, managing, and administering the leasehold and marketing the minerals extracted. *Cabot Corp. v. Brown, supra.* In other words, the lease itself creates a relationship between the lessor and lessee wherein the latter agrees to assume an operation composed of, among other things, exploration, development, production, marketing, and payment. And, this may be why courts in neighboring jurisdictions have deigned to include the exploration, development, production, and marketing of oil and gas within the definition of "operation." *See, e.g., Transcontinental Oil Co. v. Mid–Kansas Oil & Gas Co.*, 29 F.2d 323, 325 (5th Cir.1928), *cert. denied*, 279 U.S. 853, 49 S.Ct. 348, 73 L.Ed. 995 (1929) (holding that the word includes the sale and marketing of the minerals); *Bouterie v. Kleinpeter*, 258 La. 605, 247 So.2d 548, 554 (1971) (stating that operations encompass not only the marketing of the minerals but also the exploration for and development, production, and transportation of same); *Pratt v. Hays*, 190 Ky. 20, 226 S.W. 362, 362–63 (1920) (indicating the same).[3]

---

3. The Holts cite *Gulf Oil Corp. v. Southland Royalty Co.*, 478 S.W.2d 583 (Tex.App.—El Paso 1972), *affirmed*, 496 S.W.2d 547 (Tex.1973) as holding otherwise. However, the majority in *Gulf* stopped short of declaring an immutable rule. Rather, it acknowledged that production could fall within the scope of operations depending upon the particular lease involved. *Id.* at 590.

Finally, an event mentioned in the force majeure clause as a basis for relieving the lessee from performing is the "failure of carriers to transport or furnish facilities for transportation." There can be little dispute with the proposition that an entity owning a pipeline which transports minerals from the well site is a carrier. *See* TEX. NAT. RES. CODE ANN. § 111.002(1)–(2) (Vernon 1993) (stating that a common carrier includes one who owns, operates, or manages a pipeline for the transportation of crude petroleum for hire or engages in the business of transporting crude petroleum); Op. Tex. Att'y Gen. No. H–830 (1976) (stating that a pipeline transporting gas is a common carrier if it holds itself out as available to transport gas to all who may desire its services and a private carrier if it does not so hold itself out). Similarly indisputable is the proposition that at least one aspect of such a carrier's duty is to transport minerals from the well site. Before that particular duty can be performed, however, there must be production. So, before "other operations" can be delayed (for purposes of the force majeure clause) by the failure of a carrier to transport or provide transportation facilities, the phrase must of necessity and logic encompass production or the capability of the well to produce. If this were not so, then there would be little reason for the parties to have included that particular force majeure event in the clause.

Given the interrelationship between the carrier's duty to transport and the preexisting need for production, the meaning of the word "operate" when considered in the context of the oil patch, and the construction given the word by other jurisdictions, we conclude that "other operations" encompasses production under the lease before us. So, if production is delayed or interrupted because of one of the force majeure events, "the time of such delay or interruption [in production] shall not be counted against" the lessee.

### 2. Does the Force Majeure Clause Extend the Habendum Clause?

Both the Sun Parties and the Holts acknowledge that a force majeure clause could extend the lease term set forth in an habendum clause. However, the Holts believe that the former is not sufficiently worded to achieve that effect. Of course, the Sun Parties disagree. We too disagree with the Holts.

 Normally, the duration of a lease is determined by its habendum clause. *Gulf Oil Corp. v. Southland Royalty Co.,* 496 S.W.2d 547, 552 (Tex.1973). However, the lease term may be affected by other provisions in the document, depending upon the intent of the parties. *Id.* In assessing that intent, we look at the entire instrument. *Id.*

Here, the habendum clause reads:

*Subject to other provisions herein contained,* this lease shall remain in force for a term of ten years from this date, called primary term, and as long thereafter as oil, gas or other mineral is *produced* from said land, or as long thereafter as Lessee shall conduct drilling or re-working operations thereon with no cessation of more that sixty consecutive days until *production* results, and if *production* results, so long as any such mineral is *produced.*

(emphasis added). From its terms we garner several things. First, the clause is expressly subject to other provisions in the instrument. That is, other provisions may modify the life of the lease. *Stanolind Oil & Gas Co. v. Newman Bros. Drilling Co.,* 157 Tex. 489, 495–96, 305 S.W.2d 169, 173 (1957). Second, the clause designates production (or lack thereof) as the condition generally determining when the lease terminates once the primary term has lapsed. If the lessee is producing minerals in paying quantities, the lease remains viable. Once production stops and the lessee fails to drill or rework for sixty consecutive days, the lease automatically terminates.

Yet, the habendum clause is not the only provision of the lease which addresses production and its continuation. Another exists, and it is the force majeure clause. That part of the instrument speaks to how delays and interruptions in various activities, including production, should be treated. Moreover, those delays, according to the parties, would "not be counted against Lessee." Simply

put, to terminate the lease because production lapsed for reasons stated in the force majeure clause would be to "count" the delay "against the [l]essee," and that contradicts the intent of the parties as illustrated in the lease.

So too would it be tantamount to reading the provisions as requiring a forfeiture when the parties' intent to obtain such a result is hardly clear. *See Kincaid v. Gulf Oil Corp.*, 675 S.W.2d at 256 (stating that the court must "bear in mind that if ... language [of a lease] is reasonably susceptible of a construction ... that prevents a forfeiture, such construction is to be preferred to one resulting in a forfeiture"). Thus, we eschew such an interpretation of the provision, read the habendum clause in harmony with the entire lease including the force majeure clause, *see Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996) (stating that the parties' intent is determined by perusing the entire agreement so the effect one part of the agreement has on another can be assessed); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983) (stating that provisions of a contract cannot be isolated and then interpreted as isolated), and conclude that the force majeure clause has the effect of extending the habendum clause of the leases before us.

Finally, *Gulf Oil Corp. v. Southland Royalty Co.*, the case relied upon by the Holts to support a position contrary to the foregoing, is unauthoritative for several reasons. First, the court in *Gulf* recognized that the life of a lease could be affected by more than the habendum clause, depending upon the lease involved and the intent of the parties. *Id.* at 552. Second, and unlike the instrument before us, the habendum clause in *Gulf* did not say that it was subject to other provisions in the lease. More importantly, the habendum clause in *Gulf*, unlike that here, contained a time definite. That is, the parties set a specific date on which the lease would end. It was not to continue as long as there was production but was to end 50 years after its execution, regardless of the presence of production. Given the clear intent of the parties that the lease would end on a particular date, the *Gulf* court felt constrained against interpreting the force majeure clause in a manner which contradicted the unequivocal intent expressed by the parties in their agreement. *Id.* at 552.

### 3. Does the Force Majeure Clause Require that the Cause of the Cessation be Beyond the Reasonable Control of the Lessee?

The next question concerns whether the particular event causing production to cease must be outside the reasonable control of the lessee. The Holts say it does, while the Sun Parties say it does not. We conclude that the Holts are correct given the wording of the clause at issue.

Again, the matter is dependent upon the intent of the parties as garnered from the wording of the instrument involved. And, it has been held that the parties have evinced an intent that all force majeure events be outside the lessee's reasonable control where the lease names specific force majeure events and then follows that enumeration with a catch-all referring to acts beyond the lessee's reasonable control. For instance, in *PPG Industries, Inc. v. Shell Oil Co.*, 727 F.Supp. 285 (E.D.La.1989), *affirmed*, 919 F.2d 17 (5th Cir.1990), the court held that the cause there relied on did not have to be outside the parties' control. This was so because reference to the matter of control preceded the other force majeure events itemized in the clause. *Id.* at 287–88. Given this, the court held that the parties intended that the events listed after reference to "circumstances ... reasonably beyond ... control" did not have to be outside PPG's control. *Id.* at 287. However, great pains were taken by the court to distinguish those cases wherein the reference to control followed or ended the litany of other specified events. In those situations, "the reasonable control language and the enumerated events [were] plainly and grammatically tied together," according to the court. *Id.* at 288. Thus, the former served to modify the latter. And, all the itemized acts had to fall beyond the lessee's reasonable control. *Id.*

This court took a similar tack in *Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.* There, the lease specified that:

Should lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations or from producing oil or gas ... by reason of scarcity of, or inability to obtain or use transportation, equipment or material, or by reason of any Federal or state law or any order, rule or regulation of governmental authority asserting jurisdiction or otherwise by operation of force majeure (which term includes any other similar or dissimilar cause, occurrence, or circumstance not within the reasonable control of lessee), then while so prevented lessee's ... need to conduct drilling or reworking operations or to produce oil or gas shall be suspended and this lease shall remain in force so long as lessee is so prevented.

861 S.W.2d at 435. Furthermore, Hydrocarbon attempted to invoke that portion of the clause involving orders issued by "governmental authority" to justify a cessation of production by one of its wells. That is, the Railroad Commission had directed Hydrocarbon to shut in the well, and because the Commission had ordered the shut-in, Hydrocarbon was allegedly entitled to invoke the force majeure clause to ameliorate the situation. We rejected Hydrocarbon's argument, however, since the circumstance causing the cessation was within its control. *Id.* at 436.

Admittedly, the particular force majeure event invoked by Hydrocarbon did not expressly mention anything about the lessee's ability to control its occurrence. Nevertheless, reference to circumstances beyond the lessee's control was the last event mentioned in the force majeure clause. So, we implicitly interpreted it as modifying the preceding language. That is, in listing circumstances beyond the lessee's control last, the parties intended that the "cause[s], occurrence[s] or circumstance[s]" enumerated before it be outside the lessee's reasonable control before

they could serve as force majeure. *PPG Indus., Inc. v. Shell Oil Co.,* 727 F.Supp. at 288.

■ Here, the parties concluded their litany of force majeure events by mentioning causes beyond the lessee's control. Given this, and the teachings of *PPG* and *Hydrocarbon,* we hold that the juxtaposition evinced an intent that the qualification regarding control apply to each of the foregoing force majeure events. So, before any event can be successfully invoked as force majeure by the Sun Parties, it must be outside their reasonable control.[4]

### 4. Does the Shut–In Royalty Clause Pretermit the Force Majeure Clause?

Like most every oil and gas lease, that at bar contains a shut-in royalty clause. It provided that "where gas from a well producing gas only is not sold or used, Lessee may pay as royalty Fifty Dollars ($50.00) per well per year, and upon such payment it will be considered that gas is being produced within the meaning of" the habendum clause. The Holts insist that the latter superseded the force majeure clause once production ended. That is, because shut-in royalties could have been paid by the Sun Parties in lieu of production, they could not rely upon the force majeure clause to maintain the lease. We disagree.

■ Simply put, a shut-in royalty clause does not *ipso facto* take precedence over every other clause which may affect the term of the lease. The court in *Skelly Oil Co. v. Harris,* 163 Tex. 92, 352 S.W.2d 950 (1962) held as much. In that case, the court recognized that alternative means existed by which the term of the lease could be maintained. One means encompassed the payment of shut-in royalties and the other the

---

4. That the force majeure event be unforeseeable is not a prerequisite, however. *Kodiak 1981 Drilling Part. v. Delhi Gas Pipeline,* 736 S.W.2d 715, 720–21 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.). Indeed, to imply an unforeseeability requirement into a force majeure clause would be unreasonable. This is so because in naming specific force majeure events in the clause the parties undoubtedly foresaw the possibility that they could occur, and that is why they enumerated them to begin with. Yet, this does not mean that the lessee's negligence is excused simply because it encompasses an element of foreseeability. If the lessee's negligence were to cause the delay or interruption, then it is arguable that same resulted from a circumstance within its reasonable control.

performance of drilling and reworking operations without cessation of more than 60 days. Because of the existence of these options, the lessee was not "under a duty to make such [royalty] payment[s]" as the "exclusive method of maintaining the lease in force." *Id.* at 953. Either provision could be utilized. The same applies when one of the options involves invocation of a force majeure clause like that before us. *See Frost Nat'l Bank v. Matthews*, 713 S.W.2d 365, 368 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.) (stating that though Frost made the shut-in royalty payments, such were apparently unnecessary to avoid termination since the lease was susceptible to extension via the force majeure clause).

Again, force majeure clauses are now, for the most part, creatures of contract. Their meaning and scope are dependent upon the meaning and scope assigned by the parties via their agreement. Here, the parties ended the force majeure clause with the phrase "anything in this lease to the contrary notwithstanding." By including that passage in the clause, they evinced an intent to allow the lessee to rely upon the clause and its effect regardless of any other provision contained in the document. In other words, "[w]hen drilling or other operations are delayed or interrupted [by a specified force majeure event] the time of such delay or interruption shall not be counted against Lessee, [the shut-in royalty clause] notwithstanding."

 So, to heed the position espoused by the Holts would be to implicitly read the shut-in royalty clause as superseding the force majeure clause despite the parties' intent to the contrary. Instead, we opt to give meaning to all the words in the force majeure clause and reject the argument that the

Sun Parties were pretermitted from invoking force majeure merely because the lease contained a shut-in royalty clause.[5]

*b. Did the Sun Parties Prove as a Matter of Law That Production Ceased Solely Because of a Force Majeure Event?*

The second prong alluded to above involves determining whether the Sun Parties proved as a matter of law that solely a force majeure event caused the production to end. They argue that they did by simply illustrating that Panhandle could not take the gas due to the ongoing repairs to the pipeline. Upon comparing the argument to the criteria for force majeure above, we must overrule the point.

### 1. Standard of Review

 As to issues upon which the appellant had the burden of proof, we examine the record for evidence supporting the actual finding derived by the jury. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 276 (Tex.App.—Amarillo 1988, writ denied). All evidence to the contrary is ignored. *Id.* If none is found, then and only then do we peruse the contrary evidence to decide if the appellant established, as a matter of law, the finding he believes the jurors were required to enter. *Id.*

### 2. Application of Standard

 As we previously discussed, the failure of a carrier to transport or provide transportation facilities is a force majeure event under the lease. However, before it can be used to excuse the cessation of production, the Sun Parties had to establish that they lacked reasonable control over its occur-

---

5. Moreover, we find the case relied upon by the Holts, *Hughes v. Cantwell*, 540 S.W.2d 742 (Tex. Civ.App.—El Paso 1976, writ ref'd n.r.e.), as suggesting a different outcome, inapposite. First, though the *Hughes* court may have labeled the lease before it as "standard," we do not know what the force majeure clause said. It may or may not have been worded like that at bar. And, since the intent of the parties as garnered from the entire contract is controlling, *id.* at 743, we are hesitant to apply to our situation *Hughes'* interpretation of an unknown contract. Second, it does not appear that the argument presented to us was ever raised in *Hughes*; thus, *Hughes* is

hardly dispositive. Third, the circumstances in *Hughes* were unlike those at bar for the case did not pit a shut-in royalty clause against a force majeure clause. Rather, it concerned the invocation of a particular force majeure event which was specifically addressed elsewhere in the lease. That is, because the lessee was given authority to pool lands to comprise acreage sufficient to comply with the Railroad Commission's spacing requirements, *Hughes* could not claim that those spacing requirements prevented him from developing the property. *Id.* at 744–45. In other words, the contract itself negated application of the specific force majeure event.

rence and effect. *Hydrocarbon Mgmt., Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d at 436 (stating that the burden lies with the lessee to prove his affirmative defense of force majeure). That is, they had to show that they could not exercise reasonable control over the event and its cause. *See id.* (rejecting the claim of force majeure because the lessee had reasonable control of the acts which led the Railroad Commission to order the well shut in). Moreover, nowhere in their discussion of point two did they allude to evidence satisfying this requirement. And, it is not our duty to peruse the voluminous record to see if such evidence actually exists. Nevertheless, we did so and found evidence indicating that Panhandle informed the Sun Parties of its intent to conduct the repairs. Furthermore, the information was imparted to them at least 30 days prior to the initiation of the repairs. So too did various witnesses of the Sun Parties indicate that alternatives to a complete cessation of production were potentially available (though possibly not feasible) and that the repairs may have been conducted incrementally. Whether the Sun Parties had the reasonable ability to pursue those options or affect Panhandle's mode of operation is not apparent from the record. Thus, we cannot say that they proved, as a matter of law, that a force majeure event was the sole cause of the cessation, and we overrule point of error two.

Having ruled on points one, two, and three as we did relieves us from addressing the remaining points asserted by all the parties. They were contingent upon our upholding the jury's answer to the issue submitted during the liability phase of the trial. Accordingly, we reverse the judgment entered below and remand the cause for further proceedings.

### On Motions for Rehearing

The parties to this appeal moved for rehearing raising a myriad of issues. We deny rehearing but feel compelled to address the subject broached by Vantage Point Energy, Inc. (Vantage) concerning the trial court's instructed verdict in Vantage's favor.

### Background

According to the record, one of the original leases involved in this case covered approximately five and one-half sections of land, including section 156. Vantage acquired the sole well located on section 156, that is, the Holt # 1–156, by assignment from Oakwood Resources, Inc. During the period of non-production in question, Oakwood paid each of the Holts $10 for a total $50 shut-in royalty payment. According to Vantage, this served to maintain at least that portion of the lease encompassing the Holt # 1–156 well. It accordingly moved for an instructed verdict on that ground and also claimed that the Holts were estopped from arguing that the lease had terminated because they accepted the payment. The trial court granted the motion upon its belief that Oakwood's payment extended that part of the lease which encompassed the Holt # 1–156 well. The court did not base its decision on estoppel.

On appeal, the Holts argued that granting the instructed verdict constituted error since it effectively divided the determinable fee interest created by the lease into independent parcels. That could not lawfully be done absent language in the lease which permitted it, they concluded.

### Discussion

#### 1. Partial Payment of Shut-in Royalty

We must decide whether the payment of a shut-in royalty by less than all the lessees (or their assigns) can maintain portions of the lease owned by those who paid the royalty. Answering this question requires us to once again turn to the lease itself, for it dictates the rights and obligations of the parties. The provision of the lease dealing with shut-in royalties states:

Royalties to be paid by Lessee are: (a) on oil, one-eighth of that produced and saved from *said land* ... (b) on gas, including casinghead gas or other gaseous substance, produced from *said land* and sold or used off the premises, or used in the manufacture of gasoline or other product therefrom, by Lessee, the market value at the well of one-eighth of the gas so sold or used ... where gas from a well producing gas only is not sold or used, Lessee

may pay as royalty Fifty Dollars ($50.00) *per well* per year, and upon such payment it will be considered that gas is being produced within the meaning of [the habendum clause].

(emphasis added). From this provision we see that the payment by the lessee of a $50 royalty "per well per year" is tantamount to production under the habendum clause. In other words, the payment constitutes production for purposes of maintaining the entire lease.

Question arises as to what was meant by "per well" once the lessee assigned portions of the lease to others. It is clear that if only one lessee owned the leasehold, then its obligation would be to pay $50 for each well on the leasehold. But, according to Vantage, once portions of the leasehold are assigned to others, the assignment implicitly modified the duty to pay $50 for each well on all the lands described in the lease. Instead, the assignee could allegedly maintain his interest by paying $50 for each well located only on the tract it obtained from the assignor. For example, if the original leasehold encompassed two sections of land and each section had one well, then the original lessee, A, would have to pay a shut-in royalty of $50 multiplied by two wells, or $100. But, if A assigned his interest in one section to B, then both A and B could maintain their respective interests under the lease by simply paying $50 each. If one of the two did not pay, then only that part of the lease encompassing the defaulting party's interest would terminate, said Vantage. We disagree, given the lease before us.

When the lease at bar was executed, Sun was the only lessee. Though the realty encompassed by the document consisted of numerous tracts, the parties consistently referred to it as the "following land" or "said land." For instance, the realty encompassed by the lease was called "the following land." The habendum clause covered "said land,"

and royalties were to be paid from minerals obtained from "said land." From this, we conclude that the parties intended to generally treat the acreage covered by the lease as a unit or package, as opposed to independent tracts of land. *See, e.g., Orive v. Sun Oil Co.,* 346 S.W.2d 383, 384 (Tex.Civ.App.—San Antonio 1961, writ ref'd) (holding that production on one parcel of the land perpetuated the lease as to all parcels since the parties intended that the land be treated as a unit by referring to it as " 'the following described land situated in Starr County, to wit:' ").

The parties' intent comports with the generally accepted principle that habendum clauses are indivisible, unless the lease specifies otherwise. 2 H. WILLIAMS, C. MEYERS, P. MARTIN, & B. KRAMER, OIL & GAS LAW § 406 (1997); R. HEMINGWAY, THE LAW OF OIL & GAS 495–96 (2d ed.1983). It is from this principle that we derive the rule that production on any part of a tract of land described in a lease is sufficient to satisfy the habendum clause and extend the entire lease. *Id.; Orive v. Sun Oil Co.,* 346 S.W.2d at 384. Additionally, the principle has been recognized by commentators as applicable not only to production for purposes of satisfying the habendum clause but also to drilling and the payment of shut-in royalties in lieu of production. R. HEMINGWAY, THE LAW OF OIL & GAS 495–96; W.L. SUMMERS, THE LAW OF OIL & GAS § 512, p. 400–404 (2d ed.1958). This is so because the property leased is deemed to be leased as a unit and is so treated unless the agreement specifies otherwise.

When given an opportunity to specify severability, the parties to the lease did so with regard to only one aspect of the lease. Under paragraph seven of the document, they not only agreed that any party could assign, in whole or part, its interests but also that the duty to pay delay rentals could be apportioned among the various assignees of the lessee.[1] But other than this provision, noth-

---

1. Paragraph seven reads:
 The rights of either party hereto may be assigned in whole or in part and the provisions hereof shall extend to their heirs, successors and assigns, but no change or division in the ownership of the land, rentals or royalties, however accomplished, shall operate to en-

large the obligations or diminish the rights of Lessee.... *In the event of assignment of this lease as to a segregated portion of said land, the rentals, if any, payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall*

ing else in the lease purports to deviate from the established concept of treating the land as a unit. Indeed, that divisibility is mentioned regarding the duty to pay delay rentals, and nowhere else, illustrates that the parties knew of their ability to divide covenants under the lease but desired to limit the division solely to the payment of delay rentals.[2] Their intent to maintain indivisibility for all other purposes is further depicted by their agreement, in paragraph seven, that drilling on any assigned interest "inure[d] to the benefit of the owners of this lease and of any and all portions thereof."

Given the foregoing, we interpret that part of the shut-in royalty clause referring to "per well" to mean per well on the entire unit of land described in the lease. In other words, $50 had to be paid for each well existing upon the entire tract of land described in the lease before the lease could be perpetuated. It was an all or nothing proposition. Since more than one well existed upon the entire tract, the $50 payment by Oakwood did not perpetuate either the entire lease or Oakwood's pro rata interest therein.

### 2. Estoppel

As to Vantage's proposition that the Holts were estopped, as a matter of law, from claiming that the entire lease expired because they accepted $50 from Oakwood, we again disagree. Before one's acceptance of a benefit can amount to an estoppel, it must be shown that the benefit was accepted with knowledge of all material facts. *Frazier v. Wynn,* 472 S.W.2d 750, 753 (Tex.1971); *Herschbach v. City of Corpus Christi,* 883 S.W.2d 720, 737 (Tex.App.—Corpus Christi 1994, writ denied). One fact material to assessing the effect of the Holts' action concerns whether each recipient of the shut-in royalty knew that Vantage claimed it had only to pay for the Holt # 1–156 well in

order to maintain its interest in that one well. Another would be whether they knew Vantage claimed its payment of $50 would effectively modify the lease by dividing the property encompassed therein into distinct parcels. Vantage cites us no evidence addressing these issues. Nor does our own review of the record unveil evidence establishing, as a matter of law, that the Holts knew of Vantage's proposition and accepted the payment with such knowledge. Consequently, there is no basis upon which to ground the claim of estoppel and Vantage's claim of such must be disregarded.

All motions for rehearing are denied.

---

*not affect the rights of other leasehold owners hereunder.* Drilling on any portion shall inure to the benefit of the owners of this lease and of any and all portions thereof.
(emphasis added).

2. Under the rule of *expressio unius est exclusio alterius,* meaning the expression of one thing is the exclusion of another, the inclusion of divisibility in paragraph 7 indicates that its omission

from the shut-in royalty clause was intentional. *See Melvin Green, Inc. v. Questor Drilling Corp.,* 946 S.W.2d 907, 911 (Tex.App.—Amarillo 1997, no writ) (holding that the court would not include "consultant" within the definition of "operator" in the section of the contract where "consultant" was not mentioned even though a separate section expressly included "consultant" within the meaning of "operator").