02-10-062-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO.  02-10-00062-CV

 


 
 
 Allegiance Hillview, L.P.
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Range Texas Production, LLC and Range Production
 Company
 
 
  
 
 
 APPELLEES
 
 


 

----------

 

FROM THE 211th
District Court OF Denton COUNTY

----------

 

OPINION

----------

 

I. 
Introduction

          Appellant
Allegiance Hillview, L.P. (Allegiance) appeals the trial court’s declaratory
judgment in favor of Appellees Range Texas Production, LLC and Range Production
Company (collectively, Range) concerning the force majeure provision in the
Surface Use Agreement (SUA) between Allegiance and non-party Rayzor
Investments, Ltd. (Rayzor).  After a bench trial, the trial court found that
events of force majeure had occurred, and it extended the deadline under the
SUA by which Range was required to drill a well.  Challenging the legal and
factual sufficiency of the evidence, Allegiance contends in its first three
issues that the trial court erred by finding (1) that Range provided timely and
sufficient written notice of an event of force majeure, (2) that an event of
force majeure beyond Range’s reasonable control occurred, and (3) that Range
timely submitted its permit applications.  In its remaining issues, Allegiance
challenges the award of attorney’s fees to Range, the trial court’s entry of a
permanent injunction, and the trial court’s failure to make additional findings
of fact and conclusions of law requested by Allegiance.  We affirm.

II. 
Background

          Allegiance
is the surface owner of two contiguous tracts of land in Denton, Texas (the
Property); Rayzor is the mineral interest owner of the Property; and Range is
Rayzor’s oil and gas lessee.  The SUA provided that it would terminate if Range
did not commence drilling by July 11, 2009 (the Development Deadline). However,
the SUA also provided that the Development Deadline could be extended if Range
were prevented from drilling by an event of force majeure, which the SUA
defined to include the City of Denton’s (the City) failure to issue necessary
permits.  Range did not acquire the necessary permits before the Development Deadline
and initiated this litigation when Allegiance threatened to terminate the SUA.

A. 
Original Development Deadline

When
Allegiance purchased the Property’s surface estate in 2005, all minerals had
previously been reserved by Rayzor.

Allegiance
and Rayzor entered into the SUA in April 2006.[1]  Under the SUA, the
parties designated four drill sites (the Reserved Drill Sites) on the Property so
that Rayzor could drill and produce minerals, but Rayzor’s right to access and
use the Reserved Drill Sites originally terminated if it did not commence
actual drilling of a well by October 7, 2008.  The purpose of the drilling deadline
was to allow for drilling activity before Allegiance developed the surface.  Before
drilling could commence, however, Rayzor or its lessee was required to obtain a
Specific Use Permit (SUP) from the City.

In
February 2008, Rayzor and Range entered into a mineral lease (the Rayzor lease),
under which Range would attempt to drill for and develop the minerals on the
Property.  Before the parties signed the lease, Range Landman Jody Watkins had
advised Rayzor President Doug Elliott that Range would “commence the permitting
process with the City” within sixty days of signing the lease, that Range had
“been through all of the issues with the City of Denton before, and [that] by
default [Range had] become very well versed in their ordinances and policies.” 
Range was also aware before signing the Rayzor lease that Rayzor’s prior
lessee, Dark Horse, did not timely obtain permits or begin drilling and that
the lease with Dark Horse had therefore terminated, and Elliott had emphasized
to Range the need for the permit in light of the issues surrounding the Dark
Horse lease.  In fact, Range had concerns before signing the Rayzor lease about
whether it could meet the original October 2008 drilling deadline.  Even so,
Watkins informed Elliott on February 12, 2008, that Range would “diligently
pursue the permitting process, together with the SUP and all other necessary
permits and requirements as may be required by the City.”  At the same time,
however, Watkins expressly stated to Elliott that Range had “no control over”
the permitting process.

In
April 2008, Range personnel met with City representatives and discussed the
need for and the process of obtaining a SUP.  As a result of the meeting, Mary Patton,
a regulatory manager for Range, understood and expected that it would take
three months from the date of filing the application through the date of the city
council meeting to obtain approval of a SUP.  Near this same time, Allegiance
indicated to Elliott that it would agree to extend the Development Deadline for
approximately one year.

B. 
Amended Development Deadline

On
July 11, 2008, Allegiance and Rayzor executed the First Amendment to Surface
Use Agreement.  The SUA amendment reduced the number of Reserved Drill Sites
from four to one, expanded the force majeure provision to include the City’s
failure to issue a permit provided the permit application had been timely
submitted and thoroughly prosecuted to attempted completion, and extended the Development
Deadline to July 11, 2009.  Because of its experience with Dark Horse’s
inability to obtain a gas well permit from the City in 2007, Rayzor wanted to
expand the force majeure clause to specifically ensure that it applied to time
spent by the City in approving permit applications.  Watkins testified that, as
of July 2008, he felt that the one-year extension provided Range with enough
time to get the permits approved by the City so that drilling could commence
before the July 11, 2009 Development Deadline.

C. 
Pre-Permit Process

1. 
Leases and Waivers

Watkins
testified that, from his perspective as a landman, the permitting process
“really begins the day that we start evaluating a prospect” and that it
includes evaluating possible drill sites, determining applicable zoning and
waiver requirements, coordinating with surveyors to begin preparing surveys and
plats, researching to identify and contact any potentially affected adjacent mineral
owners, and obtaining necessary mineral leases and set-back waivers from those mineral
owners.  In this case, the title research revealed outstanding mineral
interests affecting a portion of the Property and adjacent tracts.  And because
the number of Reserved Drill Sites had been reduced from four to one by the SUA
amendment, Range had to determine how to drill on the southern portion of the
Property while sufficiently accessing the northern portion of the Property. 
This required a lease from the State of Texas so the wellbores could cross
beneath Highway 380 into the northern portion of the Property. Range acquired
the State of Texas lease in August 2008.

The
Reserved Drill Site reduction also required Range to acquire leases from
mineral owners adjacent to the Property because, without leases from the
adjacent mineral owners, Range would need a spacing exception from the Texas
Railroad Commission for a wellbore to be within specified distances of the
outlying tracts.  Allegiance owned the mineral interest for a tract on the
northwestern side of the Property, Albertson’s owned the mineral interest for a
tract on the eastern side of the Property, and another entity owned the mineral
interest to the north of the Property.  Range was not ultimately able to obtain
leases for the Albertson’s tract to the east or the tract to the north, but
Range negotiated with Allegiance for several months and obtained a lease from
Allegiance in December 2008.  However, Range’s title research revealed that a
joint venture owned a fifty percent interest in some of Allegiance’s adjoining
property.  The joint venture was in the process of dissolving, and Range
obtained curative leases for those mineral interests after several more months.[2]

In
addition to mineral leases and given Range’s initial plan to drill six wells on
the Property, Range was also required to obtain set-back waivers from three nearby
homeowners because of the proximity of the Reserved Drill Site to those residences.
 Range obtained the first waiver in February 2008 and the second waiver in
April 2008.  These two waivers were sufficient for Range to drill five out of
six possible gas wells on the Reserved Drill Site.  But Range believed six
wells were necessary to fully develop the minerals, and drilling six wells
required the third set-back waiver.  Range continued to seek the third waiver
by contacting and negotiating with the homeowner; Range originally offered
$500, the same amount offered to and accepted by one of the other homeowners, and
later offered to lease the property for a $4,000 bonus, the same amount paid
for the second waiver.  Range ultimately offered to lease the property with a
bonus payment between $5,000 and $10,000.  Watkins testified that Range decided
in February 2009 that it would not get the third waiver and that Range then revised
its spacing plans to drill five rather than six wells.

2. 
Surveys and Plats

In
2008, and after it signed the Rayzor lease, Range engaged the two surveyors
that had previously worked with Dark Horse to survey the Property and prepare
the plats necessary to obtain drilling permits from the City and the State of Texas.
 One surveyor prepared the plats for filing with the City, and the other
surveyor prepared the plats for obtaining State permits.  Range was able to
provide the surveyors with much of the information they needed to prepare the
plats, but the surveyors also needed information about the adjoining tracts
(and whether they would or would not be leased) before they could determine the
exact shape and size of the Property.

Range
had acquired most of the information needed by the surveyors by early 2009.  In
that regard, Patton requested on January 2 that one of the surveyors begin
preparing plats to be submitted to the City.  Watkins testified that it
generally takes a surveyor one to two months to prepare a plat but that it
depends on the circumstances.  The surveyor that prepared the plat for the City
provided a preliminary plat to Patton on January 27, and the second surveyor
forwarded the plat for the State permits to Watkins on March 4.  Range then filed
applications for the necessary permits from the Texas Railroad Commission and
the Texas Commission on Environmental Quality, and both were approved by March
13.  The state permits were then forwarded to the surveyor preparing the City gas
well plat, and the surveyor provided the final plat to Range in late March
2009. 

D.  Permit
Process

          1. 
General Permit Process 

To
drill on the Property, Range needed the City’s approval for three things:  (1)
a SUP, which is similar to a zoning ordinance; (2) a gas well permit, which is
administratively approved by City staff; and (3) a permit from the fire department,
which is issued only after the drilling rig is on site and the gas well permit
has issued.  Before the SUP can be approved by the City Council, the application
must be reviewed by the Denton Development Review Committee and the Denton Planning
and Zoning Commission.  The development review committee provides comments to
the applicant within ten days, the applicant addresses the comments, and the development
review committee then has another ten days to provide additional comments.  Typically,
once all comments by the development review committee have been addressed, the
application is scheduled for the next available planning and zoning commission hearing.

          The
planning and zoning commission meets two times each month in public hearings
that require ten days’ public notice, and it makes recommendations to the City
Council, not final decisions.  The planning and zoning commission can hold the SUP
application under advisement, table it for a future meeting, recommend approval
or denial of the application, or recommend approval of the application provided
the applicant meets additional conditions.  If not held under advisement or
tabled, the application is then scheduled for the next available City Council
meeting.

The
City Council meets once each month in a public hearing that requires fifteen
days’ public notice.  Once the SUP application is before the City Council, the
process and options available to the City Council are similar to those of the planning
and zoning commission such as tabling the application, denying the application,
or recommending approval provided certain conditions are met.  Once an
application is approved by the City Council, it generally takes four to five
days before the applicant can prepare the site, obtain the final permit from
the fire marshal, and actually begin drilling.

2. 
City of Denton Submission Schedule

In
January 2009, the City published its schedule of monthly City Council meetings for
the year.  As relevant here, the schedule showed June 16 as the last City
Council meeting date before the Development Deadline.[3] 
On March 2, 2009, the City published a Planning and Zoning and City Council Submission/Hearing
Schedule (the Submission Schedule) to provide developers with a forecast of how
long it would take to get a permit application to the City Council for hearing.

City
Planning Supervisor Charles Russell testified that the Submission Schedule was
not a new rule or regulation but was instead an attempt to accommodate developers
by committing to writing its existing policies and practices.  Russell
testified that the Submission Schedule did not lengthen the permit application
and review process, but he also testified that it could take longer for some
applications to proceed through the process under the Submission Schedule than
it may have taken in the past.[4]  Russell acknowledged,
however, that the City had hosted a luncheon with surface developers before
publishing the Submission Schedule and that mineral developers like Range were
not invited to the luncheon.

As
of March 2009, the Submission Schedule was posted in the City’s planning
office, copies were made available to the public, and a copy was posted on the
City’s website.  According to the Submission Schedule, a permit filed on March
2, 2009, would not reach the City Council for review and approval until at
least July 21, 2009.  Indeed, Patton sent an e-mail to other Range personnel on
March 31 that stated:  “Looking at the City permitting schedule, we will be on
the agenda for the August 18 City Council meeting – the earliest that we can be
approved to build location.  Will we be able to extend the 7/10/09 [sic] lease
obligation?” 

On
April 2, Patton e-mailed Elliott to ask for an extension of the Development
Deadline.  Elliott responded that only Allegiance could grant an extension,
that Allegiance would likely “demand more than a pound of flesh to do it,” and that
he was “utterly appalled” that there was an issue with drilling by the deadline
after negotiating in 2008 to “get more than enough time to file for a permit.”

3. 
Range Files SUP Application

On
April 3, Range filed its gas well plat application with the City, but the
filing did not include a SUP application.  That same day, Patton sent an
internal Range e-mail stating, “[I]t is possible that our application for Gas
Well Permit has been accepted and that we will not have to go through the SUP
process that requires P&Z and City Council hearings.  The SUP process would
result in a permit to build no sooner than 8-18-09.”  Patton further stated
that the confusion as to whether a SUP was required had been caused by (1)
inconsistent information from Dark Horse’s prior application that indicated a
SUP was required and “updated information” from Range’s surveyor that indicated
a SUP was not required; (2) the City’s “changed” process “where it takes longer
to get SUP approval”; and (3) the City planner handling the application not
knowing that the zoning had changed.  Indeed, as of April 2009, the City’s
website showed the Drill Site as being zoned “RCC-D,” which is a “drill by
right” classification that does not require a SUP.  However, Russell testified
that there was never a time that a SUP was not required, and he said the City’s
website contains a disclaimer advising applicants to contact the City with any
questions.

On
April 6, Russell informed Patton by e-mail that the applicable zoning ordinance
required Range to file a SUP application.  On April 16, Range filed its SUP
application and met with City staff to discuss the SUP application and to ask
the City to expedite the review process.  The City agreed to try to expedite
the process, and Range and the City hoped to have the SUP application heard at
the May 20 planning and zoning commission hearing and presented to the City
Council at its June 16 meeting. 

4. 
City Review of Range Application

With
Range’s filing date of April 16, the SUP application would need to be reviewed
by the development review committee and the planning and zoning commission and
approved by the City Council in two months.  Russell testified that he was
“pretty concerned when we had that meeting” on April 16 about getting before
the City Council on June 16, stating that it “would be as fast as I think we’ve
ever seen an SUP for a gas well go from start to finish.”  Even so, Range’s SUP
application was processed and distributed to the development review committee
with a proposed review due date of May 8 and a development review committee
meeting date of May 14.  Patton e-mailed City staff on April 24 to inquire
about any questions City staff may have had.

On
April 28, the City asked Range to submit a project narrative to demonstrate how
it met the SUP criteria outlined in the Denton Development Code.  Range
submitted the requested project narrative to the City on April 29, but City
staff determined that Range’s responses were not sufficient.[5]
 The City planning department returned the development review committee’s
comments to Range on May 8 and informed Range that the engineering department
had an issue with the proposed driveways on the site plan and that the issue
had to be resolved before the public hearing.

For
Range’s applications to be considered at the May 20 hearing, all development
review committee comments had to be addressed by May 12.  The driveway access
issue was not resolved by that date, and the City informed Range that the SUP
application would instead be considered at the June 3 planning and zoning
commission hearing.  Range met with the development review committee on May 14
to resolve the outstanding comments, and both agreed that Range would have to amend
the project site plan and apply for a second driveway permit through the
variance process at a later date.  Range submitted all recommended revisions to
the development review committee on May 21, and the development review
committee released the project on May 28.

In
the meantime, the City had provided public notice on May 7 that Range’s SUP
application would be considered at the May 20 planning and zoning commission hearing,
even though the development review committee comments had not yet been resolved. 
The City would not typically send this notice before resolving the development
review committee comments, but the City did so to try to expedite the process. 
Unfortunately, the City’s May 7 notice incorrectly listed a RCC-D zoning
classification, which does not require a SUP, instead of the correct NRMU
zoning classification, which does require a SUP. The City discovered the
notification error on May 26, and Range notified Allegiance of the City’s notification
error on May 29.

Because
public notices must be posted ten days prior to a planning and zoning
commission hearing, consideration of Range’s SUP application had to be
postponed to the June 17 planning and zoning commission hearing, meaning the
SUP application could not be considered by the City Council until at least July
21, ten days after the Development Deadline.  At the June 17 hearing, the planning
and zoning commission recommended approval of the SUP application by a vote of
four in favor and none opposed.

E. 
Range Requests Extension of Development Deadline

On
May 20, Range requested that Allegiance agree to a three-month extension of the
July 11 Development Deadline.  On May 29, Watkins e-mailed Rex Paine with
Allegiance asking if there had “been any discussions regarding Range’s request
for an extension of the Development Deadline.”  Paine testified that Allegiance
knew in early May that it would not grant an extension to Range without getting
something in return, and he admitted that he did not respond to Range’s request
until June 18 when he informed Range that Allegiance did not agree to an extension.

On
June 19, Range asked Rayzor president Elliott for help in getting an extension
of the Development Deadline from Allegiance.  Elliott contacted Allegiance, but
he testified that he felt that Range’s inability to meet the Development
Deadline and need for an extension was “completely the fault of Range” for not
timely filing the SUP application and that he would consider suing Range if
Rayzor lost its drilling rights.  Similarly, Elliott stated in an e-mail to
Watkins that he had informed Allegiance of his disappointment with Range but that
he had also advised Allegiance that a short delay “would not damage them
economically in any significant way and that they were not likely going to be
able to avoid wells on the property just by denying this extension.” 

F. 
Force Majeure Notice and Resulting Litigation

          On
June 29, Range notified Allegiance by letter that it believed an event of force
majeure had occurred based on the City’s failure to issue the permits.  Range’s
letter stated, in part, that the City “has failed to issue an SUP and Gas Well
Permit (the “Permits”) as required to drill a gas well at the location as set
forth in the Amended SUA.”  The notice letter then explained that the City had
acknowledged making a notification error that required Range’s application to
be considered at the June 17 planning and zoning commission hearing instead of
the June 3 hearing, meaning Range’s application could not be considered by the
City Council until at least July 21.

On
July 8, Allegiance responded to the notice letter by objecting to the requested
extension, contesting whether an event of force majeure had occurred, and
informing Range that it intended to enforce the Development Deadline.  On July
10, one day before the Development Deadline, Range filed this suit seeking a
declaration that an event of force majeure had occurred and requesting
attorneys’ fees and a temporary restraining order and injunction against Allegiance. 
The trial court granted the temporary restraining order, and the parties subsequently
agreed to extend the injunction through the time of trial.

G.  The
City’s Subsequent SUP Approval

The
City Council’s first opportunity to consider and vote on Range’s SUP application
was July 21, 2009.  At that meeting, however, the City Council tabled the application
and did so again in August, eventually approving Range’s SUP application on October
6.  The City then approved Range’s Gas Well Plat on November 3.  Michael
Middlebrook, Range’s Vice President of Operations for the Barnett Shale
testified that if the trial court permitted Range to proceed, there was no
further impediment to Range’s ability to drill on the Property.

H. 
Bench Trial

The
case proceeded to a bench trial beginning November 9, 2009, and the trial court
signed a final judgment for Range on November 25, 2009.  In its judgment, the
trial court recited that an event of force majeure had occurred, that Range had
given proper notice to Allegiance, and that the July 11, 2009 Development
Deadline would be extended to the forty-fifth day after the date of the
judgment.  The trial court also awarded attorney’s fees of $210,000 to Range.
Allegiance timely requested findings of fact and conclusions of law, and the
trial court issued sixty-seven findings of fact and twenty-one conclusions of
law. Allegiance then requested that the trial court make additional findings of
fact and conclusions of law, but the trial court did not make the requested
additional findings.  Allegiance then filed notice of this appeal.

III. 
Standards of Review

          Findings
of fact entered in a case tried to the court have the same force and dignity as
a jury’s answers to jury questions.  Anderson v. City of Seven Points,
806 S.W.2d 791, 794 (Tex. 1991).  The trial court’s findings of fact are
reviewable for legal and factual sufficiency of the evidence to support them by
the same standards that are applied in reviewing evidence supporting a jury=s
answer.  Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Catalina v.
Blasdel, 881 S.W.2d 295, 297 (Tex. 1994).

          We
may sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.  Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334
(Tex. 1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, "No
Evidence" and "Insufficient Evidence" Points of Error, 38
Tex. L. Rev. 361, 362–63 (1960).  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.  Cent. Ready Mix Concrete Co. v. Islas, 228 S.W.3d 649, 651 (Tex.
2007); City of Keller v. Wilson, 168 S.W.3d 802, 807, 827 (Tex. 2005).  

          Anything
more than a scintilla of evidence is legally sufficient to support the
finding.  Cont’l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.
1996); Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996).  When the
evidence offered to prove a vital fact is so weak as to do no more than create
a mere surmise or suspicion of its existence, the evidence is no more than a
scintilla and, in legal effect, is no evidence.  Kindred v. Con/Chem, Inc.,
650 S.W.2d 61, 63 (Tex. 1983).  More than a scintilla of evidence exists if the
evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of a vital fact.  Rocor Int‘l, Inc. v.
Nat’l Union Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).

          When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the
credible evidence supporting the finding is so weak, or so contrary to the
overwhelming weight of all the evidence, that the answer should be set aside
and a new trial ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635
(Tex. 1986) (op. on reh’g); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.
1965).

IV. 
Applicable Law

          “[W]hen
the parties have themselves defined the contours of force majeure in their
agreement, those contours dictate the application, effect, and scope of force
majeure,” and reviewing courts “are not at liberty to rewrite the contract or
interpret it in a manner which the parties never intended.”  Sun Operating
Ltd. P’ship v. Holt, 984 S.W.2d 277, 283 (Tex. App.—Amarillo 1998, pet.
denied); see Moore v. Jet Stream Invs., Ltd., 261 S.W.3d 412, 420 (Tex.
App.—Texarkana 2008, pet. denied).  When construing contracts and other written
instruments, our primary concern is to ascertain the true intent of the parties
as expressed in the instrument.  Wood Care Ctrs., Inc. v. Evangel Temple
Assembly of God, 307 S.W.3d 816, 820 (Tex. App.—Fort Worth 2010, pet.
denied); NP Anderson Cotton Exch., L.P. v. Potter, 230 S.W.3d 457, 463
(Tex. App.—Fort Worth 2007, no pet.).  We examine the entire contract in an
effort to harmonize and give effect to all provisions so that none are rendered
meaningless.  Wood Care, 307 S.W.3d at 820; see also J.M. Davidson,
Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003).  “We construe contracts
‘from a utilitarian standpoint bearing in mind the particular business activity
sought to be served’ and ‘will avoid when possible and proper a construction
which is unreasonable, inequitable, and oppressive.’” Frost Nat’l Bank v. L
& F Dist., Ltd., 165 S.W.3d 310, 312 (Tex. 2005) (quoting Reilly v.
Rangers Mgmt., Inc., 727 S.W.2d 527, 530 (Tex. 1987)). 

V.  Force
Majeure

          In
its first three issues, Allegiance contends that the evidence is legally and
factually insufficient to support the trial court’s findings (1) that Range
timely provided sufficient written notice of an event of force majeure, (2) that
an event of force majeure beyond Range’s reasonable control occurred, and (3) that
Range timely submitted its permit applications. 

A. 
Timely and Sufficient Notice

          Allegiance
argues in its third issue that there is legally and factually insufficient
evidence to support the trial court’s findings that Range provided timely and
sufficient written notice of an event of force majeure.

          The
SUA provided that a party desiring to extend the Development Deadline due to an
event of force majeure was required to give written notification to the other
party at least five business days before the Development Deadline.  The SUA
further provided that the notice “shall include an explanation of the claimed
Force Majeure event and a good faith approximation of the date that such
matters shall be resolved, and the corresponding anticipated extension to the
Development Deadline.”

The
Development Deadline was July 11, 2009.  Range’s June 29, 2009 notice letter,
in its entirety, stated:

Pursuant to Section 6
of the First Amendment to Surface Use Agreement (“Amended SUA”), Range Texas
Production, LLC (“Range”) hereby advises you that an event of Force Majeure as
defined under the Surface Use Agreement (“SUA”) and the Amended SUA has
occurred and will require an extension to the Anticipated Development Deadline
as defined in the Amended SUA.

 

The City of Denton
has failed to issue an SUP and Gas Well Permit (the “Permits”) as required to
drill a gas well at the location as set forth in the Amended SUA.  On May 26,
2009, Chuck Russell, AICP, Planning Supervisor, Planning Department of the City
of Denton acknowledged that the City of Denton had made a notification error
that would require rescheduling of the June 3, 2009 Planning and Zoning
hearing, delaying the meeting until June 17, 2009 and causing the earliest City
Council meeting that could be scheduled to be July 21, 2009.

 

Range believes that
the City of Denton will issue the Permits at the July 21, 2009 City Council
meeting as referenced above.

 

The anticipated
extension to the Development Deadline as defined in the SUA and Amended SUA is
45 days.

 

Allegiance
argues that although the notice letter “makes a reference to the City’s failure
to issue an SUP and Gas Well Permit, that reference is clearly within the
limited context of the City’s notification error.”  Allegiance’s argument is,
however, based on the incorrect premise that the City’s failure to issue the
permit and the City’s notification error are separate and distinct events of
force majeure.  Rather, as discussed in more detail below, the City’s
notification error allegedly prevented the City Council from considering the
SUP application by the Development Deadline.

The
SUA required that Range, at least five business days before the July 11, 2009
Development Deadline, give Allegiance written notice containing an explanation
of the claimed event of force majeure, a good faith estimation of the date the
event would be resolved, and the corresponding anticipated extension to the
Development Deadline.  The June 29, 2009 notice letter complies in each
respect.  It was sent more than five business days before the Development
Deadline, stated that the City had failed to issue the SUP and Gas Well Permit,
set forth an expected resolution date of July 21, and stated that the
anticipated Development Deadline extension would be forty-five days.  Range’s
statement in the letter concerning the City’s notification error is the
explanation of the City’s failure to issue the permits by the Development
Deadline and is not, as Allegiance incorrectly contends, a limitation of the
claimed event of force majeure or notice of a separate and unrelated event of
force majeure.

          Applying
the appropriate standards of review, we hold the evidence is legally and
factually sufficient to support the trial court’s findings that Range provided
timely and sufficient notice to Allegiance of an alleged event of force
majeure.  See Cent. Ready Mix Concrete Co., 228 S.W.3d at 651; Pool,
715 S.W.2d at 635.  We overrule Allegiance’s third issue.

B. 
An Event of Force Majeure Occurred

          Allegiance
argues in its first issue that the trial court erred by finding that an event
of force majeure beyond Range’s reasonable control occurred because no event of
force majeure occurred as a matter of law and because there is legally and
factually insufficient evidence to the support the trial court’s finding.  In
its second issue, Allegiance contends that the trial court incorrectly
interpreted the meaning of “timely” in the submission of Range’s permit
application and alternatively that “timely” is ambiguous, and that there is
legally and factually insufficient evidence to support the trial court’s
finding that Range timely submitted its permit applications.  Because
Allegiance’s first and second issues are closely related, we consider them
together.

          1. 
Relevant Contractual Provisions

          As
amended, the SUA provided that the Development Deadline was July 11, 2009.  As
relevant in this appeal, Range’s right to drill on the Property terminated if
it did not drill by the July 11, 2009 Development Deadline unless the deadline
was extended by an event of force majeure.  As amended and as relevant to
Allegiance’s first and second issues, the force majeure provision in the SUA
stated:

“Force Majeure” as
used herein shall mean . . . the City of Denton’s (or other governmental
authority’s) failure to issue permits (provided that the Permit Seeker has
timely submitted permit applications and thoroughly prosecuted such
applications to attempted completion) . . . so long as such
event is beyond the reasonable control of the Party claiming the benefit of
such Force Majeure and only in the event such Party is taking all reasonable
action to remedy such Force Majeure. 

 

          2. 
The City Failed to Issue Permits

          Allegiance
contends that the trial court erred by finding that an event of force majeure
occurred because the City did not fail to issue the permit by the deadline.  In
other words, Allegiance argues that before the City could be found to have
failed to issue the permit, the City necessarily must have had an opportunity
before the July 11 Development Deadline to “consider and vote on the permit
application in time for Range to meet its deadline.”  But the SUA did not
require that the City have an opportunity to consider and vote on the permit
application before it could be found to have failed to issue permits.  

The
SUA defined an event of force majeure to include “the City of Denton’s . . . failure
to issue permits” so long as (1) Range timely submitted and thoroughly
prosecuted the permit application to completion, (2) the City’s failure to
issue the permit was beyond Range’s reasonable control, and (3) Range took “all
reasonable action” to remedy the City’s failure to issue the permit.  Thus, the
City’s failure to issue permits could qualify as an event of force majeure
under the SUA if these three conditions were met.  But Allegiance’s argument
would add a fourth condition requiring the City to have an opportunity to
consider and vote on the application before the Development Deadline.  Because
we are not permitted to rewrite the SUA, we reject Allegiance’s contention that
an event of force majeure did not, as a matter of law, occur because the City
did not have an opportunity before the Development Deadline to consider and
vote on Range’s permit application.  See, e.g., Sun Operating Ltd., 984
S.W.2d at 283 (stating that an appellate court is “not at liberty to rewrite
the contract or interpret it in a manner which the parties never intended”).

Allegiance
also argues that the City’s notification error is not a qualifying event of
force majeure because the City’s error did not cause Range’s application to be
delayed beyond the Development Deadline.  Specifically, Allegiance argues that
Range’s failure to address the driveway access issue by May 12 caused the planning
and zoning commission hearing to be rescheduled for June 3 and that there was
not sufficient time by June 3 to provide fifteen days’ public notice before the
June 16 City Council meeting, the last meeting before the Development
Deadline.  Range responds that the City would have considered the SUP application
by the Development Deadline but for the City’s notification error. 

          Allegiance
attempts to separate and individually challenge the City’s failure to issue
permits and the City’s notification error as separate events of force majeure. 
Rather, the City’s notification error caused the City Council to not have the
opportunity to consider the SUP application before the Development Deadline,
and legally and factually sufficient evidence supports the trial court’s
finding that the City failed to issue the permits.

          Range
filed its application for a Gas Well Permit on April 3, 2009.  Russell, the
City planning supervisor, testified that the City’s website showed at that time
that the drill site was zoned RCC-D, which did not require a SUP.  The City
notified Range on April 6 that the applicable zoning ordinance did require a
SUP, and Range filed its SUP application on April 16.  Also on April 16, Range
met with City officials and requested expedited review of the SUP application, and
the City agreed to get the application through the process as quickly as
possible.  To accomplish this, the City sent public notice of the May 20 planning
and zoning commission hearing on May 7, even though the City would typically
have waited to issue the notice after all comments by the development review
committee were resolved.  The SUP application was tabled from the May 20 to the
June 3 planning and zoning commission hearing because the development review
committee comments were not resolved, but no new additional public notice was
required.  Range submitted a revised site plan on May 21, and the development
review committee released the project on May 28.  Moreover, Russell testified
that the City could have sent a notice for the June 16 City Council meeting in
advance of the planning and zoning commission hearing and that the City has
given similar notices “from time to time” in the past.  In the interim,
however, Russell discovered on May 26 that the May 7 notice mistakenly listed a
zoning code of RCC-D instead of NRMU, and this required a new public notice
before the planning and zoning commission could consider Range’s SUP
application.  Russell testified that the notification error caused Range’s SUP
application to be delayed from the June 3 to the June 17 planning and zoning
commission hearing and that but for the notification error, the SUP application
could have been considered by the City Council on June 16. 

Allegiance
also argues the evidence is insufficient because Range believed on May 20 (six
days before learning of the City’s notification error) that it could not meet
the July 11 Development Deadline.  We disagree, however, because the evidence
reflects that but for the notification error, the SUP application would have
been considered at the June 3 planning and zoning commission hearing and that the
City could have timely given public notice (prior to the June 3 planning and
zoning commission hearing) that the SUP application would be considered at the
June 16 City Council meeting.  Thus, despite Range’s belief on May 20 that it
could not meet the July 11 Development Deadline, other evidence reflects that
meeting the deadline was still possible.  

          3. 
Range Timely Submitted Permit Applications

Allegiance
argues that the trial court incorrectly interpreted the meaning of “timely,”
alternatively that “timely” is ambiguous, and that there is legally and
factually insufficient evidence to support the trial court’s finding that Range
timely submitted its permit applications. 

                   (a) 
Trial Court’s Interpretation of “Timely”

          The
trial court interpreted “timely” to mean that the permit applications had to be
submitted “within a reasonable time considering all the circumstances.”
Allegiance contends the trial court’s interpretation is erroneous because
“timely” must be construed “in the context of an agree[d]-to hard and fast
drilling deadline, which, if not met, would cause the ‘immediate’ termination
of Rayzor’s and Range’s right to drill at all.”  See generally Sun Operating
Ltd., 984 S.W.2d at 281 (holding that oil and gas lease required production
to resume within sixty days of cessation rather than within a reasonable time
because the lease provided that it terminated if production ceased for more
than sixty consecutive days).  Allegiance’s argument is misplaced, however,
because it attempts to imply a set permit application deadline into the SUA
even though the SUA did not contain any such deadline.  The SUA clearly
included the July 11 Development Deadline by which Range was required to
commence actual drilling, but the SUA did not state that time was of the
essence nor set forth a deadline by which Range was required to submit its permit
applications.  Instead, the SUA stated that the City’s failure to issue permits
qualified as an event of force majeure “provided that [Range] timely submitted
permit applications and thoroughly prosecuted such applications to attempted
completion.”

“[W]here
no time for performance is stated in a contract, the law will imply a
reasonable time.”  CherCo Props., Inc. v. Law, Snakard & Gambill, P.C.,
985 S.W.2d 262, 266 (Tex. App.—Fort Worth 1999, no pet.) (citing Moore v.
Dilworth, 142 Tex. 538, 542, 179 S.W.2d 940, 942 (1944); Fitzsimmons v.
Anthony, 716 S.W.2d 719, 720 (Tex. App.—Corpus Christi 1986, no writ)).  Reasonableness
is determined by the facts and circumstances of the case.  CherCo Props.,
Inc., 985 S.W.2d at 266 (citing Solomon v. Greenblatt, 812 S.W.2d 7,
15 (Tex. App.—Dallas 1991, no writ); Heritage Res., Inc. v. Anschutz Corp.,
689 S.W.2d 952, 955 (Tex. App.—El Paso 1985, writ ref’d n.r.e.)).  Because the force
majeure provision did not define “timely” or set forth a date by which the permit
applications had to be filed, the law implies that Range was required to file
the permit applications within a reasonable time based on the facts and
circumstances of the case.[6]  See CherCo Props.,
Inc., 985 S.W.2d at 266.  Therefore, the trial court did not err by
interpreting “timely” as “within a reasonable time considering all the
circumstances,” nor is “timely” ambiguous.  See id.

                   (b) 
Timeliness of Range’s Permit Applications

          Allegiance
also argues there is legally and factually insufficient evidence that Range
timely submitted its permit applications.  In doing so, Allegiance points to
evidence that Range believed when it signed the Rayzor lease in February 2008
that eight months would be sufficient time to perform all tasks necessary to
drill by the original October 2008 drilling deadline; that once the SUA was
amended in July 2008, Range had a full year to begin drilling; that Range had
two set-back waivers by April 2008, the same number it had when it decided in
February 2009 to proceed without the third set-back waiver; that Range was
aware it could face opposition from the community at public hearings; and that
once Range’s SUP application was approved in October 2009, it took Range almost
another month to obtain a gas well plat.  Allegiance also points to evidence that
Range expected the SUP process to take at least three months; that despite this
knowledge, Range did not file the SUP application until April 16, two months
before the June 16 City Council meeting; that Range knew by the end of March
that it would have trouble meeting the Development Deadline; and that Range had
to ask the City to expedite its application once it had been filed.

          While
Allegiance’s arguments are supported by the record, there is also other
evidence supporting the trial court’s findings that Range submitted its permit
application within a reasonable time under the circumstances.  The evidence in
the record shows that an operator such as Range must evaluate and decide on
drill sites; determine the applicable zoning and waiver requirements; work with
surveyors to prepare the necessary surveys and plats; identify, contact, and
obtain leases from nearby mineral interest owners; identify, contact, and
obtain set-back waivers from nearby homeowners within a certain distance; and
prepare, file, and prosecute the permits to completion.  The complexity of each
of these tasks depends on the circumstances in each case.

The
July 2008 amendment to the SUA reduced the number of drill sites from four to
one, meaning Range could only drill on the southern portion of the Property while
attempting to sufficiently access the minerals on the northern portion of the
Property.  This required that Range obtain leases from the State of Texas to
cross Highway 380 and from other adjacent mineral owners to avoid the need for
a spacing exception from the Texas Railroad Commission.  Range began negotiating
these leases by at least August 2008.

In
order to drill the six wells on the Property that Range believed necessary to
fully develop the minerals, Range was also required to obtain set-back waivers
from three homeowners.  Range acquired the first two waivers by April 2008, and
Allegiance contends that Range knew by August 2008 that it would not be able to
obtain the third waiver.  However, the record includes evidence that Range
continued negotiations beyond that time.  As of September 2008, the third homeowner
wanted Range to make its best offer without further negotiation; Range, by November
2008, had made an offer of $4,000 to the homeowner, and Range ultimately
offered to lease the homeowner’s property for between $5,000 and $10,000.  The
homeowner refused, and Range decided in February 2009 that it had to proceed
with only two set-back waivers and drill five wells on the Property instead of
six.

In
the meantime, Patton had requested on January 2, 2009, that the surveyors begin
preparing the plats for submission to the City.  In addition, Range submitted
applications to and received permits from the Texas Railroad Commission and the
Texas Commission on Environmental Quality in March 2009, and the surveyor
finalized the final plat for submission to the City in late March 2009.

Range
then filed its application for a Gas Well Plat on April 3, three months before
the Development Deadline.  Although Range had believed all along that a SUP
would also be required, both the City’s website and Range’s surveyor had
recently indicated that a SUP was not required, and the City planner that
accepted Range’s Gas Well Plat application told Patton on April 3 that it was
at least possible that Range would not have to go through the SUP process.  But
on April 6, the City informed Range that a SUP was in fact required, and Range
submitted its SUP application ten days later.  When it filed its SUP
application, Range met with City officials and requested that the City expedite
the SUP process, and the City agreed.  As of April 16, the plan was to have the
SUP application before the planning and zoning commission on May 20 and before
the City Council on June 16.  Thereafter, and as discussed above, Range’s SUP
application was ultimately postponed to the June 17 planning and zoning
commission hearing and the July 21 City Council meeting because of the zoning
classification error in the City’s May 7 public notice. 

Relying
heavily on the fact that Range had acquired the second set-back waiver in April
2008 and could have proceeded with five wells instead of six, Allegiance argues
that Range could have filed its permit applications in sufficient time to
obtain approval by the Development Deadline but instead made a “conscious and
informed business decision to delay filing its applications in order to try to
increase its profits.”  However, Range had a duty to act as a reasonably
prudent operator under the same or similar circumstances and to reasonably
develop the premises.  See Grayson v. Crescendo Res., L.P., 104 S.W.3d
736, 739 (Tex. App.—Amarillo 2003, pet. denied) (citing Amoco Prod. Co. v.
Alexander, 622 S.W.2d 563, 567 (Tex. 1981); Clifton v. Koontz, 325
S.W.2d 684, 693 (Tex. 1959)).  And there is evidence that Range believed six
wells (and thus the third set-back waiver) were necessary to fully develop the
Property and that Range decided in February 2009, five months before the
Development Deadline, to proceed with five wells instead of six after the third
homeowner rejected an offer well in excess of what had been accepted by the
other two homeowners.

Finally,
Allegiance argues that “a slew of hypothetical and improbable events would have
had to take place” for Range to meet the July 11 Development Deadline given its
April 16 SUP application filing date.  But Allegiance’s argument is based on a
strict application of the City’s submission schedule—which was first published
in March 2009, and is a guideline rather than a rule of law—and ignores the
City’s agreement to expedite Range’s SUP application, the City’s advance public
notice (contrary to its normal practice) of action on Range’s application, and
the possibility—but for the City’s May 7 notification error—that the City
Council could have considered the SUP application on June 16, almost a month before
the Development Deadline.

          The
facts of this case present a close call.  There is, as Allegiance aptly points
out, evidence that Range may have waited too long to submit its SUP
application.  But there is also evidence that Range acted reasonably under the
circumstances to obtain the necessary leases and set-back waivers, prepare the
surveys and plats, comply with its obligations to act as a prudent operator to
fully develop the minerals, and file the permit application in time to drill by
the Development Deadline.  As the trier of fact, the trial court determines the
credibility of the witnesses and the weight to be given their testimony, and we
may not substitute our judgment for that of the fact finder simply because we might
disagree with the fact finder’s conclusions.  Pool, 715 S.W.2d at 635; see
In re Doe 4, 19 S.W.3d 322, 325 (Tex. 2000).  With these principles in
mind, considering the evidence favorable to the trial court’s findings if a
reasonable factfinder could, and disregarding evidence contrary to the finding
unless a reasonable factfinder could not, we hold that legally sufficient
evidence supports the trial court’s findings that Range timely filed its permit
applications.  See Cent. Ready Mix Concrete Co., 228 S.W.3d at 651; City
of Keller, 168 S.W.3d at 807, 827.  In addition, after considering and
weighing all of the evidence in the record pertinent to the trial court’s findings,
we hold that the credible evidence supporting the finding is not so weak or
contrary to the overwhelming weight of all the evidence that the trial court’s
findings should be set aside and a new trial ordered.  See Pool, 715
S.W.2d at 635; Garza, 395 S.W.2d at 823.  Thus, we overrule Allegiance’s
first and second issues.[7]

VI. 
Permanent Injunction and Attorney’s Fees

          Allegiance
argues in its fourth issue that the trial court erred by issuing a permanent
injunction against it and awarding attorney’s fees to Range and that Allegiance
is entitled to its attorney’s fees because no event of force majeure occurred. 
As discussed above, however, we have held that legally and factually sufficient
evidence supports the trial court’s findings that an event of force majeure
occurred, that Range timely submitted its permit applications, and that Range
provided timely and sufficient notice to Allegiance of the event of force
majeure.  Thus, the trial court did not err by issuing a permanent injunction
or by awarding attorney’s fees to Range.[8]  We therefore overrule
Allegiance’s fourth issue.

VII. 
Additional Findings of Fact and Conclusions of Law

          In
its final issue,[9] Allegiance argues that
“this Court cannot ascertain which events the trial court relied upon” because
“the trial court did not specify [in its findings of fact and conclusions of
law] which alleged event(s) constituted events of force majeure as defined in
the SUA.”  Citing the criminal case of State v. Cullen, 195 S.W.3d 696,
699 (Tex. Crim. App. 2006), Allegiance contends that the trial court’s failure
to grant Allegiance’s request for additional findings of fact and conclusions
of law “prevented Allegiance from properly presenting its arguments on
appeal.”  However, Allegiance does not identify which requested but refused
additional finding prevented it from properly presenting its appellate
argument, nor does Allegiance explain how the trial court’s refusal to make the
additional finding prevented Allegiance from presenting its appellate
argument.  

An
appellate brief must contain argument and the authorities and facts relied upon
for the appeal with references to the pages in the record where those facts can
be found.  Weaver v. Sw. Nat’l Bank, 813 S.W.2d 481, 482 (Tex. 1991); see
also Tex. R. App. P. 38.1(f), (i).  An inadequately briefed issue may be
waived on appeal.  Hall v. Stephenson, 919 S.W.2d 454, 467 (Tex.
App.—Fort Worth 1996, writ denied); see also Fredonia State Bank v. Gen. Am.
Life Ins. Co., 881 S.W.2d 279, 284–85 (Tex. 1994) (discussing the
“long-standing rule” that a point may be waived due to inadequate briefing). 
Because Allegiance’s final issue does not contain appropriate argument or
citations to the record,
we
overrule it as inadequately briefed.  

VIII. 
Conclusion

          Having
overruled each of Allegiance’s issues, we affirm the trial court’s judgment.

 

 

ANNE GARDNER
JUSTICE

 

PANEL: 
GARDNER,
MEIER, and GABRIEL, JJ.

 

DELIVERED:  July 28, 2011









[1]As the current surface
owner, Allegiance plans to develop the Property into a mixed-use development
known as Rayzor Ranch. 





[2]Range finalized the
curative leases in the summer of 2009, after it had submitted its SUP
application to the City.  It also applied for a spacing exception from the
Texas Railroad Commission after initially submitting plats to the City showing
the wellbores “short” of their eventual locations.





[3]The July City Council meeting
occurred on July 21, 2009.





[4]Patton and Watkins
referred to the Submission Schedule as “new” in their testimony, and Patton
explained that she believed it was new because it showed a four-month SUP
process whereas Russell had informed her in April 2008 that the SUP process
took “up to three months.”  Patton further testified that she was told by City
staff in April 2009, after the City published the Submission Schedule, that a
SUP could be approved in as little as two months if everything was correct when
submitted.





[5]Range submitted a revised
project narrative on May 13.





[6]Allegiance contends that
the trial court should have interpreted “timely” to mean “the submission of
permit applications to the City by a date which, in the usual and ordinary
course of business, would result in the issuance of all necessary permits in
time for Range to commence drilling by July 11.”  But Allegiance has not
provided any authority approving of its proposed interpretation.  Further, the
trial court interpreted “timely” to mean “within a reasonable time considering
all the circumstances,” and this interpretation necessarily includes what would
be done in the usual and ordinary course of business.  The trial court’s
interpretation also necessarily allowed for consideration of the City’s
Submission Schedule, the apparent flexibility within that Submission Schedule,
the City’s attempts to try to expedite the application process, and the
possibility of approval but for the City’s notification error.





[7]In light of our holdings
above, we need not address whether other events such as the filing of this
lawsuit, the City’s submission schedule, or lack of cooperation by third
parties also constituted events of force majeure or whether Range provided
timely notice of those events.  See Tex. R. App. P. 47.1.





[8]Allegiance’s only
challenge to the permanent injunction and award of attorney’s fees is that the
trial court erred by finding that an event of force majeure occurred. 
Allegiance does not contend, for example, that the permanent injunction is
overly broad or that the attorney’s fees awarded are not reasonable and necessary.






[9]Allegiance does not
specifically list this argument as a separate issue but does raise it in the
alternative to its other four issues.